1  BILAL A. ESSAYLI
   Acting United States Attorney
2  DAVID T. RYAN
   Assistant United States Attorney
3  Chief, National Security Division
   FRANCES S. LEWIS (Cal. Bar No. 291055)
4  Chief, General Crimes Section
   IAN V. YANNIELLO (Cal. Bar No. 265481)
5  Chief, Terrorism and Export Crimes Section
   Assistant United States Attorneys
6        1200 United States Courthouse
         312 North Spring Street
7        Los Angeles, California 90012
         Telephone:     (213) 894-4850 / 3667
8        Facsimile:     (213) 894-0141
         Email:         Frances.Lewis@usdoj.gov
9                       Ian.Yanniello@usdoj.gov

10 Attorneys for Plaintiff
   UNITED STATES OF AMERICA

11

12              UNITED STATES DISTRICT COURT

13         FOR THE CENTRAL DISTRICT OF CALIFORNIA

14 UNITED STATES OF AMERICA,          No. 2:25-CR-571-ODW

15         Plaintiff,                 GOVERNMENT'S SENTENCING POSITION
                                      FOR DEFENDANT ANDREW KYLE WHITE
16              v.

17 ANDREW KYLE WHITE                  Hearing Date: September 15, 2025
                                      Hearing Time: 11:30 a.m.
18         Defendant.                 Location:     Courtroom of the
                                                    Honorable Otis D.
19                                                  Wright, II

20

21      Plaintiff United States of America, by and through its counsel

22 of record, the Acting United States Attorney for the Central District

23 of California and Assistant United States Attorneys Frances S. Lewis

24 and Ian. V. Yanniello, hereby files its Sentencing Position for

25 defendant Andrew Kyle White.

26 //

27 //

28

1        This Sentencing Position is based upon the attached memorandum

2   of points and authorities, the files and records in this case, and

3   such further evidence and argument as the Court may permit.

4    Dated: September 15, 2025          Respectfully submitted,

5                                       BILAL A. ESSAYLI
                                        Acting United States Attorney
6
                                        DAVID T. RYAN
7                                       Assistant United States Attorney
                                        Chief, National Security Division
8

9                                            /s/
                                        FRANCES S. LEWIS
10                                      Assistant United States Attorney

11                                      Attorneys for Plaintiff
                                        UNITED STATES OF AMERICA
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                        2

1                     **MEMORANDUM OF POINTS AND AUTHORITIES**

2    **I.    INTRODUCTION**

3         Defendant Andrew Kyle White ("defendant") landed his private

4    plane not once, but twice, onto a secured United States Naval Base

5    located on San Clemente Island in the Pacific Ocean.  While there, he

6    stole a truck and evaded capture overnight and trespassed on highly

7    sensitive military property.  Defendant has agreed to plead guilty to

8    two crimes: (1) theft of government property over $1,000, a felony

9    violation of 18 U.S.C. § 641, and (2) illegal entry into a Naval

10   installation, a Class B misdemeanor in violation of 18 U.S.C. § 1382.

11        Defendant has been detained since he cut his ankle bracelet in

12   early July 2025 in violation of the terms of his bond.  Defendant's

13   change of plea hearing is scheduled to take place on September 15,

14   2025.  The parties stipulated to the preparation of a Modified

15   Presentence Investigation Report so that his sentencing could occur

16   on the same day as his change-of-plea hearing; however, the United

17   States Probation and Pretrial Services Office ("Probation") has not

18   yet provided the report.  Based on currently available information,

19   the parties both anticipate that defendant's Guidelines range will be

20   0-6 months, but recognize that this range is subject to change upon

21   receipt of Probation's report.

22        Assuming no new information becomes available, the government

23   recommends that the Court impose a high-end sentence of six months'

24   custody followed by a three-year period of supervised release.  The

25   government also requests that the Court order restitution to the Navy

26   in the amount of $8,077.  Representatives of the Navy plan to attend

27   the sentencing hearing by video conference.

28

                                      1

1 **II.  STATEMENT OF FACTS**

2    **A.   Defendant's Plea Agreement**

3       The following facts are taken from paragraph 13, the Factual

4 Basis of defendant's Plea Agreement:

5       San Clemente Island is owned and operated by the United States

6 Navy and is part of the Naval Base Coronado.  San Clemente Island is

7 located in Los Angeles County, within the Central District of

8 California.  At all relevant times, defendant knew it was illegal to

9 travel to or access San Clemente Island without first obtaining

10 permission from the Navy and/or a government official with authority

11 to grant such access.

12       On or about October 29, 2023, defendant flew a Glastar Plane

13 with tail number N-48007 (the "Airplane") to San Clemente Island and

14 landed the plane on a Naval airstrip without permission from the

15 Navy.  Defendant was subsequently arrested for trespass and removed

16 from the island.  At the time, defendant received, acknowledged, and

17 signed a disbarment letter that (1) notified defendant that it was a

18 federal crime to travel to San Clemente Island without permission

19 from the Navy, and (2) instructed defendant not to return to the

20 island.

21       On April 6, 2025, defendant again flew the Airplane to San

22 Clemente Island and landed it on a Naval airstrip without permission

23 from the Navy.  While on San Clemente Island, defendant located and

24 stole a white Ford F-150 truck (the "Navy Truck"), which was property

25 of the United States Navy having an aggregate value in excess of

26 $1,000, specifically, approximately $16,000.  Defendant stole the

27 Navy Truck with the intent to deprive the government of the use and

28 benefit.  After stealing the Navy Truck, defendant drove it to

1  various locations on San Clemente Island, including locations that

2  were blocked by locked gates.  To gain access to those locations,

3  defendant used the Navy Truck to damage and destroy the gate

4  structures, causing approximately $8,077 in damage and costs to tow

5  the truck.

6      **B.**    **Victim Impact Statement**

7      The victim, here the United States Navy, has provided a victim

8  impact statement from Captain L. M. Jacobi, the Commanding Officer of

9  Naval Base Coronado, which oversees the Navy's operations on San

10  Clemente Island.  (Exhibit A.)

11      Captain Jacobi has described how truly dangerous defendant's

12  intrusion onto the Naval Base was, costing nearly 500 man-hours and

13  resulting in a loss of $500,000 to the American taxpayer.  (Id. at

14  1.)  When defendant landed his plane -- for the second time on San

15  Clemente Island -- Captain Jacobi had no choice but to order a total

16  lockdown.  (Id.)  He had only five security personnel available to

17  protect the approximately 80 people who were located on the island

18  and did not know the nature of the threat or the level of hostility

19  he faced.  When his personnel found an abandoned plane on the island,

20  he had very little information with which to evaluate the threat the

21  Navy was facing; he had no idea who the intruder was, how many

22  intruders there were, whether the intruders were armed, or what their

23  intentions were.  (Id.)  He had to assume the worst.  Two personnel

24  had to stay with the plane while the remaining three personnel began

25  to conduct a sweep of the area to locate the intruder(s).  (Id.)

26  Night tactical movements in the area were inherently dangerous given

27  (1) the marine layer, (2) the uncertainty of the unknown threat, and

28  (3) the potential presence of unexploded ordnances in the area.

1  (Id.)  Captain Jacobi had to make multiple difficult decisions about

2  how to resolve the situation, particularly after learning that a

3  truck had been stolen in the middle of the night.  (Id.)

4      Even after defendant's apprehension and federal charges in this

5  case, Captain Jacobi was faced with further uncertainty about what

6  level of threat defendant posed.  Captain Jacobi's statement further

7  described the additional threat assessment that had to be conducted

8  given defendant's refusal to follow orders to stay away from the

9  island.  (Id. at 2.)  Not only was this defendant's second incursion

10  onto the island, but even after he was charged federal with felony

11  crimes, he cut his ankle bracelet, resulting again in the expenditure

12  of resources and man hours to ensure the safety of the facilities.

13  (Id. at 2.)

14      The victim has asked this Court to sentence defendant to the

15  maximum extent permitted under the law.

16  **III.  GUIDELINES CALCULATION**

17      In the Plea Agreement, the parties agreed to the following

18  Guidelines range:

19      Base Offense Level:              6        U.S.S.G. § 2B1.1(a)(2)

20      >$15,000 Intended Losses        +4          U.S.S.S. § 2B1.1(b)

21  The parties stipulated to the preparation of a Modified Presentence

22  Report, which would have calculated defendant's criminal history

23  category.  However, as of the date of this filing, no such report has

24  been filed.  The government is not aware of any previous criminal

25  convictions; therefore, subject to new information being provided by

26  the United States Probation and Pretrial Services Office, the

27  government anticipates that defendant's criminal history category is

28  I and that defendant would be entitled to a two-level deduction for

4

being a zero-point offender and a two-level deduction for acceptance

of responsibility.  With a total offense level of 6, his Guidelines

range would be 0-6 months.

**IV.  GOVERNMENT'S RECOMMENDED SENTENCE**

The government recommends that the Court impose a high-end

Guidelines sentence of six months' custody, followed by a three-year

period of supervised release, and order $8,077 in restitution to the

victim, which here is the United States Navy.  The government

believes this term of imprisonment and supervised release is

appropriate, reasonable, and not greater than necessary, in light of

all the factors the Court must consider under 18 U.S.C. § 3553(a).

Defendant's criminal conduct caused a serious danger to public

safety and to the United States Navy.  The seriousness of defendant's

offense, the need to protect the public, and the need for just

punishment all warrant a high-end Guidelines sentence in this case.

In October 2023, defendant flew a private plane onto San

Clemente Island.  The Navy approached him with caution and warned him

not to come back -- the island was 100% military owned and operated.

But come back he did.  In April 2025 he returned.  This time,

however, he abandoned his plane and began wandering throughout the

island, stealing a truck, damaging a gate, and engaging in whatever

behavior he felt like.  Whatever defendant's intentions were, the

military did not know them; they responded as one might expect the

military to respond to an unknown threat: they assumed the worst.

The island went on a complete lockdown.  Personnel engaged in a

highly dangerous mission to locate the unknown intruder(s)

notwithstanding the dangers they were exposing themselves too, from

1 the weather, the terrain, and the potential unexploded ordnances that

2 could have been underfoot in that area.  (Exhibit A.)

3    Defendant's conduct was extraordinarily dangerous.  It is easy

4 to see how someone could have been seriously injured or killed from

5 defendant's unauthorized intrusion onto the Naval base, including

6 defendant himself.  Luckily, he was apprehended safely in the

7 morning.

8    In mitigation, defendant quickly accepted responsibility in this

9 case and has also agreed to abandon his plane and, as a condition of

10 supervised release, not seek to renew or use his pilot's license.  He

11 has also agreed to stay away from San Clemente Island, or any other

12 Naval facility.  On balance, defendant's mitigation and acceptance of

13 responsibility is accounted for in the government's recommendation of

14 a six-month sentence.

15 **V.    CONCLUSION**

16    For the foregoing reasons, the government respectfully requests

17 that this Court sentence defendant to six-months' imprisonment; a

18 three-year term of supervised release under the agreed-upon

19 supervised release conditions; a mandatory special assessment of

20 $110; and order defendant to pay restitution in the amount of $8,077.

21

22

23

24

25

26

27

28

# EXHIBIT A

CUI



**DEPARTMENT OF THE NAVY**
COMMANDING OFFICER
NAVAL BASE CORONADO
BOX 357033
SAN DIEGO, CALIFORNIA 92135-7033

IN REPLY REFER TO:
5600
Ser N00J/124
September 11, 2025

Honorable Otis D. Wright II
First Street Courthouse
350 W. 1st Street
Los Angeles, CA 90012

Subj:   NAVY VICTIM IMPACT STATEMENT: US V. WHITE

Honorable Judge Wright,

   Mr. White's unauthorized landing on San Clemente Island put Naval Base Coronado active duty and civil service members at risk while negatively impacting military readiness and costing the DOD nearly 500 man-hours and ~$500K.

   As Commanding Officer of Naval Base Coronado (NBC), I oversee San Clemente Island (SCI), an island wholly-owned by the US Navy and used for high-end training activities, including bombing ranges, aviation ranges and critical Explosive Ordnance Disposal and Navy SEAL training facilities. NBC maintains a daily cadre of 80-100 personnel on SCI to maintain operations for up to several hundred personnel involved in tactical training exercises on island.

   On the evening of April 6th, 2025, I was notified that Naval Security Forces identified an unoccupied plane on an abandoned landing strip on SCI. I immediately stood up the NBC Emergency Operations Center, recalling key personnel to respond to this potentially dangerous incursion. With only 5x security personnel to protect ~80 personnel on a remote 35,000 acre island, and extremely limited communications, I had few options. Facing possibly hostile threat, I ordered a lockdown. 2x security personnel stayed with the plane, leaving only 3x security personnel to cover the SCI "town" area. Our personnel were dangerously exposed and ill-prepared to spend a full night on patrol. Given extremely challenging "marine layer" weather and inherent risk of night tactical helicopter insertion, I made the difficult decision to delay arrival of additional security personnel until the following morning. Shortly before midnight, I was notified that a truck was reported stolen, significantly increasing the probability of a hostile act. Security forces landed the next day, searched for and successfully apprehended Mr. White.

   Having spent >24 years in tactical aviation spanning seven world-wide deployments, I am no stranger to difficult risk decisions. Mr. White's actions forced NBC to make multiple risk decisions that exceeded my comfort level and that could have resulted in death or injury. Night tactical movements are always risky, especially for junior security personnel responding to unplanned events. Additionally, the overland search exposed my personnel to multiple historic bombing ranges that have not been swept for unexploded ordnance. Last Wednesday, Explosive Ordnance Disposal found a fully-exposed 1940s era air-to-ground rocket just off one of SCI's main roads highlighting the danger created by Mr. White's crimes. This risk is real. To divert additional security personnel to SCI, I reduced manning at my gates and security patrols at other

CUI

locations, more than doubling patrol vehicle response times and hindering essential functions at these locations. NBC expended more than 450 man-hours in response; subsequent unscheduled flight to and from SCI costs ~$200K. Mr. White's aircraft has been abandoned on SCI; decommissioning and disposal is likely to cost the taxpayer well over $250K, including transportation via flatbed to the pier, barging back to mainland, follow-on transportation to a disposal facility and hazardous material disposal.

Mr. White repeatedly and willful disregarded National Defense Airspace boundaries and violated controlled-access military installations. This is not his first landing on SCI – his first successful landing occurred on October 29, 2023. Even after Mr. White was arrested, he frequently posted on social media claiming a desire to return to the island to get his plane. After he cut his ankle monitor, NBC was forced to step up security and airspace monitoring, detracting from other critical functions. Based on Mr. White's repeated and flagrant disregard for the rule of law, he is likely to re-attempt an unauthorized access of SCI. As such, I ask this court to sentence Mr. White to the maximum extent permitted under the law.

My point of contact in this matter is LT Alejandro Balandran, JAGC, USN, who can be reached at 619-███████ or by e-mail at ██████████████████l@us.navy.mil.

Sincerely,

L. M. JACOBI